THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF UTAH

| | |
|---|---|
| THOMAS B. and T.B.,<br><br>                    Plaintiffs,<br><br>vs.<br><br>AETNA LIFE INSURANCE COMPANY, and<br>the DEUTSCHE BANK MEDICAL PLAN,<br><br>                    Defendants. | Civil No. 1:21-cv-00142-DBP<br><br>**MEMORANDUM DECISION AND<br>ORDER**<br><br>Chief Magistrate Judge Dustin B. Pead |

Before the Court are three motions: Plaintiffs' Motion for Summary Judgment,[1]

Defendants' Motion for Summary Judgment,[2] and Defendants' Motion to Exclude Plaintiffs'

Expert Dr. Jeffrey Kovnick.[3]  Oral argument on these motions was held on January 31, 2025.

Having considered the parties' motion papers,[4] the administrative record[5] that the parties filed

with the Court under seal,[6] and the parties' arguments and presentations during the January 31,

2025 hearing, the Court **GRANTS** Defendants' Motion for Summary Judgment, **DENIES**

Plaintiffs' Motion for Summary Judgment, and **DENIES** Defendants' Motion to Exclude

Plaintiffs' Expert Dr. Jeffrey Kovnick as moot.

## FACTUAL BACKGROUND

Plaintiff Thomas B. was an eligible participant in the Deutsche Bank Medical Plan (the

---

[1] ECF No. 62.
[2] ECF No. 63.
[3] ECF No. 65.
[4] ECF Nos. 62, 63, 65, 72, 73, 74, 77, 78, & 79.
[5] ECF No. 82.
[6] ECF No. 81.

"**Plan**"), an ERISA-governed welfare benefit plan sponsored by Thomas B.'s employer, Deutsche Bank.[7]  The sponsor's Omnibus Group Health Benefits Plan wraparound document (the "**Wrap Document**")[8] notes that the Plan provides various employee benefits, including medical, dental, and long-term disability benefits.[9]  Thomas B.'s son, T.B., was an eligible dependent under the Plan.[10]

The Plan's medical benefits were provided pursuant to a group health plan administered by Aetna.[11]  The Plan's medical benefits are self-funded meaning that "Benefits under the Medical Plan are funded by contributions from the general assets of Deutsche Bank and by contributions from Medical Plan participants."[12]

**Plan Provisions**

The Wrap Document grants Aetna, as a claims administrator, the discretion to interpret the Plan and make determinations regarding eligibility for benefits.  Specifically, the Wrap Document states the claims fiduciary:

> Shall have the power and the duty to take all actions and to make all decisions necessary or proper to carry out its responsibilities, powers and duties under the Plan. All determinations of the Plan Administrator or other fiduciary as set forth in the applicable Covered Group Health Plan Document as to any question involving its responsibilities, powers and duties under the Plan, including, without limitation, interpretation of the Plan, or as to any discretionary items to be taken under the Plan, shall be solely at the discretion of the Plan Administrator or other

---

[7] Second Amended Complaint ("SAC"), ECF No. 26, ¶¶ 3-4.; AR 998, 1504.  The administrative record was previously filed jointly by the parties under seal with the Court and bates numbered AR000001 – AR001539.  The record will be referred to herein as AR 1 through AR 1539.
[8] AR 1502 - AR 1532.
[9] AR 1504.
[10] SAC, ¶ 4.
[11] AR 997 (noting Aetna as the "Medical Claims Administrator and Claims Reviewer"); AR 995 ("The Claims Administrators (Aetna or CVS Caremark) does not serve as an insurer, but merely a claims processor.").
[12] AR 995.

fiduciary as set forth in the applicable Covered Group Health Plan Document and shall be final, conclusive and binding on all persons claiming to have any right or interest in or under the Plan. Benefits under this Plan shall be paid only if the Plan Administrator or other fiduciary as set forth in the applicable Covered Group Health Plan Document decides, in its discretion, that the applicant is entitled to them.[13]

"To be covered by the Medical Plan, services and supplies must meet all" the requirements of the Plan.  These requirements include, among other things:  (1) "The service or supply must be covered by the Medical Plan," (2) "provided while coverage is in effect," and (3) "be medically necessary" as defined by the Plan.[14]  To be "covered by the Medical Plan," the "service or supply" must:

(a) "Be included as a covered expense in this SPD,"

(b) "Not be an excluded expense under this SPD,"

(c) "Not exceed the maximums and limitations outlined in this SPD," and

(d) "Be obtained in accordance with all the terms, policies and procedures outlined in this SPD."[15]

The "Covered Services and Supplies" section of the Plan states:  "This section describes which expenses are covered expenses. Only expenses incurred for the services and supplies shown in this section are covered expenses. Limitations and exclusions apply."[16]  The Plan then describes a comprehensive list of services and supplies for which participants and their beneficiaries may qualify.[17]

Among the inpatient covered services and supplies are "charges made by a skilled

---

[13] AR 1509.
[14] AR 938.
[15] *Id.*
[16] *Id.*
[17] *See* AR 939-962.

nursing facility during your stay."[18]  Skilled nursing facilities further include stays at inpatient "rehabilitation hospitals."[19]  The expenses covered by the Plan include "room and board" up to the facility's "semi-private room rate."[20]  Skilled nursing facilities are defined by the Plan.[21]

The Plan also covers services for mental health services and supplies, which are defined as "charges incurred in a hospital, psychiatric hospital, residential treatment facility or Behavioral Health Provider's office for the treatment of mental disorders . . . ."[22] The Plan pays expenses for "room and board at the semi-private room rate, and other services and supplies provided during your stay in a hospital, psychiatric hospital or residential treatment facility. Inpatient benefits are payable only if your condition requires services that are only available in an inpatient setting."[23]  These facilities and providers—"psychiatric hospital," "residential treatment facility" and "behavioral health provider"—are also defined by the Plan.[24]

To qualify as a "Residential Treatment Facility (Mental Disorders)," "an institution" must meet all the following requirements:

- Is accredited by one of the following agencies, commissions or committees for the services being provided: The Joint Commission (TJC), Committee on Accreditation of Rehabilitation Facilities (CARF), American Osteopathic Association's Healthcare Facilities Accreditation Program (HFAP) or the Council on Accreditation (COA); or is credentialed by Aetna;
- Meets all applicable licensing standards established by the jurisdiction in which it is located;
- Performs a comprehensive patient assessment preferably before admission, but at least upon admission;

---

[18] AR 944.
[19] AR 1012.
[20] AR 941, 944.
[21] AR 1011-12.
[22] AR 961.
[23] AR 961.
[24] AR 1008 (psychiatric hospital), 1010 (residential treatment facility), 998 (behavioral health provider).

- Creates individualized active treatment plans directed toward the alleviation of the impairment that caused the admission;
- Has the ability to involve family/support systems in the therapeutic process;
- Has the level of skilled intervention and provision of care must be consistent with the patient's illness and risk;
- Provides access to psychiatric care by a psychiatrist as necessary for the provision of such care;
- Provides treatment services that are managed by a behavioral health provider who functions under the direction/supervision of a medical director; and
- Is not a wilderness treatment program (whether or not the program is part of a licensed residential treatment facility, or otherwise licensed institution), educational services, schooling or any such related or similar program, including therapeutic programs within a school setting.

In addition to the above requirements, for Mental Health Residential Treatment Programs:

- A behavioral health provider must be actively on duty 24 hours per day for 7 days a week;
- The patient is treated by a psychiatrist at least once per week; and
- The medical director must be a psychiatrist.[25]

To qualify as a "Skilled Nursing Facility" under the Plan, "an institution" must meet all

the following requirements:

- It is licensed to provide, and does provide, the following on an inpatient basis for persons convalescing from illness or injury:
  — Professional nursing care by an R.N., or by a L.P.N. directed by a full-time R.N.; and
  — Physical restoration services to help patients to meet a goal of self-care in daily living activities.
- Provides 24 hour a day nursing care by licensed nurses directed by a full-time R.N.
- Is supervised full-time by a physician or an R.N.
- Keeps a complete medical record on each patient.
- Has a utilization review plan.
- Is not mainly a place for rest, for the aged, for drug addicts, for alcoholics, for mental retardates, for custodial or educational care, or for care of Mental Disorders.
- Charges patients for its services.
- An institution or a distinct part of an institution that meets all of the following

---

[25] AR 1010.

requirements:
    — It is licensed or approved under state or local law.
    — Is primarily engaged in providing skilled nursing care and related services
       for residents who require medical or nursing care, or rehabilitation
       services for the rehabilitation of injured, disabled, or sick persons.
  ▪ Qualifies as a skilled nursing facility under Medicare or as an institution
    accredited by:
    — The Joint Commission on Accreditation of Health Care Organizations;
    — The Bureau of Hospitals of the American Osteopathic Association; or
    — The Commission on the Accreditation of Rehabilitative Facilities.[26]

"Skilled nursing facility does not include:

  ▪ Institutions which provide only:
    — Minimal care;
    — Custodial care services;
    — Ambulatory; or
    —Part-time care services.
  ▪ Institutions which primarily provide for the care and treatment of alcoholism,
    substance abuse or mental disorders."[27]

**T.B.'s Stay at Waypoint Academy**

On October 17, 2018, T.B. was admitted to Waypoint Academy and remained there until

June 6, 2019.  T.B. was admitted again on October 1, 2019, and then eventually discharged on

March 21, 2020.[28]  Plaintiffs did not seek precertification of T.B.'s admission but waited until

January 31, 2019, approximately 2 ½ months after his admittance, to submit a claim for

benefits.[29]

On February 1, 2019, Aetna reviewer Marci Bookman contacted Waypoint Academy and

---

[26] AR 1011.

[27] AR 1012.

[28] SAC, ECF No. 26, ⁋ 5.  On October 1, 2019, coverage switched from the Deutsche Bank Medical Plan to an ERISA plan established or maintained by Thomas B.'s new employer, Bank of America.  Plaintiffs have dropped their claim involving the Bank of America Plan. *Compare* Amended Compl., ECF No. 15 *with* SAC, ECF No. 26.

[29] *See* AR 50 (noting a "Retrospective Review" with a "Retro dept. received claim Date: 1/31/2019").

spoke with "Waypoint Academy admissions coordinator Emily Deeter . . . via telephone."[30]  Ms.

Deeter "verified the below information," including that Waypoint Academy did not have "[a]

behavioral health provider . . . actively on duty 24 hours per day for 7 days a week."[31]  That

same day, Aetna denied coverage for T.B.'s stay at Waypoint Academy.  The reasons given for

the denial were:

> We reviewed information received about the member's condition and circumstances and
> the member's benefit plan. We are denying coverage for Mental Health Residential
> treatment. Mental Health Residential treatment programs must have a behavioral health
> provider actively on duty 24 hours per day for 7 days a week. Therefore, Mental Health
> Residential treatment is not covered under the terms of the plan.[32]

**Plaintiffs' Level One Appeal**

In a letter dated June 20, 2019, Plaintiffs appealed the dates of service "12/01/2018-

12/31/2018; and 02/01/2019 forward."[33]  Plaintiffs argued coverage should be allowed because

Waypoint Academy had behavioral health professionals available "on-call 24 hours a day."

Plaintiffs asserted that because the Plan did not define "actively on duty," the language of the

Plan was ambiguous.  They acknowledged that Aetna had interpreted the phrase "actively on-

duty" to mean "on-site," but they avowed that Aetna should have interpreted the language

instead to mean "on-call."

Plaintiffs concluded that T.B.'s treatment was a "covered benefit" under the Plan because

"Waypoint is duly licensed by the state of Utah, in accordance with Utah state regulations for

residential treatment centers," "accredited by The Joint Commission," and "the services provided

---

[30] AR 49.
[31] AR 50.
[32] AR 2-3.
[33] AR 57.

were clinical in nature."[34]  Plaintiffs did not claim that Waypoint Academy had behavioral health providers on-site 24 hours per day, 7 days per week.[35]  Finally, after quoting federal regulations and the DOL's "Final Rules" from November 2013, Plaintiffs argued that MHPAEA mandated a grant of benefits because "it seems unfair and unreasonable for Aetna to require Waypoint to meet so many requirements—including that a behavioral health provider must be available on-site 24 hours a day—when my plan's definition of a comparable intermediate medical facility does not include a comparable requirement."[36]

On July 26, 2019, after reviewing the appeal, Aetna reviewer Cynthia Sanchez determined that Waypoint Academy was not covered because the facility did not meet the Plan's residential treatment facility requirements.[37]  On July 26, 2019, Aetna issued a letter upholding its original denial. The letter reiterated the same basis as set forth previoulsy: "Mental health residential treatment programs must have a behavioral health provider actively on duty 24 hours per day for 7 days per week. Therefore, services rendered by Waypoint Academy [sic] is not covered under the terms of the plan."  Aetna noted that "[a] complaint and appeal analyst, who was not involved in the original decision, participated in the review of the appeal."[38]

**Plaintiffs' Level Two Appeal**

On September 16, 2019, Plaintiffs submitted a level two appeal.  Plaintiffs argued that the level one letter upholding the denial of benefits was wrong because T.B.'s "treatment at Waypoint *is a covered benefit under our plan*."  Plaintiffs reiterated their prior claim that T.B.'s

---

[34] AR 60.
[35] *See* AR 57-64.
[36] AR 63.
[37] AR 896-897.
[38] AR 603-604.

treatment at Waypoint Academy should be covered because it (1) was licensed, (2) accredited and (3) Aetna's interpretation of "actively on-duty" to require an on-site behavioral health provider was "problematic."[39]

Plaintiffs averred their previous appeal raised concerns with violations of ERISA and MHPAEA, but Aetna's response was "superficial and dismissive." They also complained that their review of "Aetna's website" showed the position held by Ms. Sanchez, the Aetna complaint and appeals analyst who performed the level one review, only required a high school diploma. Plaintiffs claimed having Ms. Sanchez review the appeal "seem[ed] inappropriate and unethical" because ERISA entitled Plaintiffs to have a "vocational expert" review their appeal.[40] As before, Plaintiffs did not contest Aetna's factual conclusion—that Waypoint Academy did not have a behavioral health provider on-site 24 hours per day, 7 days per week.[41]

On October 1, 2019, Aetna Complaint and Appeal Analyst Robin Nickson reviewed Plaintiffs' level two appeal. Ms. Nickson concluded the prior denials were correct and would be upheld.[42] In a letter dated October 17, 2019, Aetna informed Plaintiffs: "[W]e are standing by our earlier decision to uphold the denial for the mental health treatment." The letter explained: "We reviewed your concerns, which we received on September 20, 2019, about your recent claims," and "are responding to the appeal of our decision about the following issue(s)." The letter then listed the total billed charges and noted Aetna's basis for denial: "Denial code" "840-These expenses are not covered as this facility does not meet the plan definition for a Residential

---

[39] AR 627-630 (emphasis in original).
[40] AR 629.
[41] *See* AR 627-30.
[42] AR 897.

Treatment Facility."  "We are denying coverage for mental health residential treatment for [T.B.].  Mental health residential treatment programs must have a behavioral health provider actively on duty 24 hours per day for 7 days a week.  Therefore, services rendered by Waypoint Academy [sic] is not covered under the terms of the plan."[43]  Aetna explained that upholding its denial was based "solely upon the reasons set forth above.  We did not evaluate any other basis for exclusion (e.g., medical necessity of service or supply) that may be applicable to the circumstances at this time."  Aetna noted that a "complaint and appeal analyst, who was not involved in any of the previous decisions, participated in the review of the appeal."[44]

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[45]  "When both parties move for summary judgment in an ERISA case, thereby stipulating that a trial is unnecessary, summary judgment is merely a vehicle for deciding the case; the factual determination of eligibility of benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor."[46]

In *Firestone Tire & Rubber Co. v. Bruch*, the Supreme Court explained "that a denial of benefits under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or

---

[43] AR 882-83.
[44] AR 883-84.
[45] Fed. R. Civ. P. 56(a).
[46] *Harvey T. v. Aetna Life Ins. Co.*, 508 F. Supp. 3d 1088, 1094 (D. Utah 2020) (cleaned up); *James C. v. Aetna Health and Life Ins. Co.,* 499 F.Supp.3d 1105, 1114 (D. Utah 2020); *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010).

construe the terms of the plan."[47]  A court "applies an 'arbitrary and capricious' standard to a plan administrator's actions if the plan grants the administrator discretionary authority to determine eligibility for benefits or to construe the plan's terms."[48]

>     Here, the Wrap Document grants Aetna:
>
>     The power and the duty to take all actions and to make all decisions necessary or proper to carry out its responsibilities, powers and duties under the Plan. All determinations of the Plan Administrator or other fiduciary as set forth in the applicable Covered Group Health Plan Document as to any question involving its responsibilities, powers and duties under the Plan, including, without limitation, interpretation of the Plan, or as to any discretionary items to be taken under the Plan, shall be solely at the discretion or the Plan Administrator or other fiduciary as set forth in the applicable Covered Group Health Plan Document and shall be final, conclusive and binding on all persons claiming to have any right or interest in or under the Plan. Benefits under this Plan shall be paid only if the Plan Administrator or other fiduciary as set forth in the applicable Covered Group Health Plan Document decides. in its discretion. that the applicant is entitled to them.[49]

This Plan language is sufficient to vest in Aetna the discretionary authority to determine whether Plaintiffs' claim for treatment was covered under the Plan.[50] Thus, the Court will review Aetna's benefits decision under the arbitrary and capricious standard of review.

>     Applying the arbitrary and capricious standard of review, the function of the Court is to

---

[47] *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

[48] *Charter Canyon Treatment Ctr. v. Pool Co.*, 153 F.3d 1132, 1135 (10th Cir. 1998) (citing *Firestone*, 489 U.S. at 115); *see also Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1097 (10th Cir. 1999).

[49] AR 1509.

[50] *See James C.,* 499 F.Supp.3d at 1114 (recognizing that the language "the claims administrator has the full discretionary authority to interpret and construe the terms of the Plan and to decide questions related to the payment of benefits" triggers the arbitrary and capricious standard of review); *Harvey T.*, 508 F. Supp.3d at 1095 and n.40 (recognizing similarly broad discretionary language triggered the arbitrary and capricious standard of review); *see Winchester v. Prudential Life Ins. Co. of Am.*, 975 F.2d 1479, 1483 (10th Cir. 1992) (finding discretionary authority in language stating that the insurer, "as Claims Administrator, determines the benefits for which an individual qualifies under the Benefit Plan").

determine "whether the administrator's actions were arbitrary and capricious, not in determining whether [plaintiff] was, in the district court's view, entitled to . . . benefits."[51]  "[T]his standard is a difficult one for a claimant to overcome."[52] Aetna's decision may not be set aside if it is "reasonable and made in good faith."[53]  In fact, "any reasonable basis will be upheld; it need not be the only logical or even the best decision."[54] As long as the administrator's decision "fall[s] somewhere on a continuum of reasonableness—even if on the low end," the decision must be upheld.[55]

A reasonable, good faith decision is based on substantial evidence in the administrative record.[56]  "Substantial evidence is of the sort that a reasonable mind could accept as sufficient to support a conclusion.  Substantial evidence means more than a scintilla, of course, yet less than a preponderance."[57]  Moreover, "[w]hen a plan administrator is given authority to interpret the plan language, and more than one interpretation is rational, the administrator can choose any rational alternative."[58]

---

[51] *Sandoval v. Aetna Life and Cas. Ins. Co.,* 967 F.2d 377, 381 (10th Cir. 1992).

[52] *Nance v. Sun Life Assur. Co. of Canada,* 294 F.3d 1263, 1269 (10th Cir. 2002).

[53] *Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co.*, 491 F.3d 1180, 1189 (10th Cir. 2007).

[54] *Rademacher v. Colo. Ass'n of Soil Conservation Districts. Med. Benefit Plan*, 11 F.3d 1567, 1570 (10th Cir. 1993).

[55] *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1097 (10th Cir. 1987)..

[56] *Sandoval,* 967 F.2d at 382 ("[W]e must consider whether [the administrator]'s determination that Sandoval was not disabled was arbitrary and capricious because it was unsupported by substantial evidence."); *Adamson v. Unum Life Ins. Co. of America*, 455 F.3d 1209, 1212 (10th Cir. 2006) ("A lack of substantial evidence often indicates an arbitrary and capricious decision.").

[57] *Adamson*, 455 F.3d at 1212 (citations omitted).

[58] *Kimber*, 196 F.3d at 1100 (citing *Naugle v. O'Connell*, 833 F.2d 1391, 1396 (10th Cir. 1987)); *see also, Peter M.*, 554 F.Supp.3d at 1224-25 (concluding that "if the term 'wilderness treatment programs' is ambiguous," "and Aetna adopted one of two or more reasonable interpretations,

Plaintiffs claim "the MHPAEA cause of action requires *de novo* review because it involves the question of whether the Defendant has violated a federal statute."[59]  Plaintiffs are correct that the Court's interpretation of a statute is a legal question subject to de novo review.[60]  However, when the Court reviews Aetna's benefits decision or its Plan interpretations, those actions are subject to the arbitrary and capricious standard of review regardless of whether that review is part of Plaintiffs' benefits claim under § 1132(a)(1)(B) or their MHPAEA claim under § 1132(a)(3).  It is the "actions" of the claims administrator,[61] not the nature of the cause of action, that are reviewed for abuse of discretion.

## DISCUSSION

## I.    PLAINTIFFS' BENEFITS CLAIM.

Plaintiffs' first cause of action seeks benefits for T.B.'s treatment at Waypoint Academy pursuant to 29 U.S.C. § 1132(a)(1)(b).  Title 29 U.S.C. § 1132(a)(1)(B) states, "a civil action may be brought — (1) by a participant or beneficiary — (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  The Tenth Circuit has explained that the language of the plan controls a participant's entitlement to benefits.[62]  When seeking benefits pursuant to

---

then Aetna's decision to deny benefits based on that interpretation survives arbitrary and capricious review").

[59] ECF No. 62 at 7.

[60] *See, e.g., Douglas S. v. Altius Health Plans, Inc.*, 409 Fed.Appx. 219, 223 (10th Cir. 2010).

[61] *Sandoval*, 967 F.2d at 381 (the Court is to determine "whether the administrator's actions were arbitrary and capricious, not in determining whether [claimant] was, in the district court's view, entitled to . . . benefits").

[62] *See Palmer v. Metropolitan Life Ins. Co.*, 415 F.App'x 913, 920 (10th Cir. 2011) (citing *Alexander v. Anheuser-Busch Cos., Inc.*, 990 F.2d 536, 538−39 (10th Cir. 1993)).

§1132(a)(1)(B), it is the plaintiff's burden to establish entitlement to benefits.[63]

The Plan imposed certain requirements for facilities to qualify as a "Residential treatment facility." Those requirements expressly included that the facility have a "behavioral health provider . . . actively on duty 24 hours per day for 7 days a week."[64]  Despite Plaintiff T.B.'s initial admittance to Waypoint Academy on October 17, 2018,[65] and again on October 1, 2019,[66] Plaintiffs did not seek precertification of T.B.'s second admission until January 31, 2019, approximately 2 ½ months after his admittance.[67]  After receiving the claim, on February 1, 2019, Aetna contacted Waypoint Academy and spoke with its "admissions coordinator Emily Deeter . . . via telephone."  Ms. Deeter "verified the below information," including that Waypoint Academy did not have "[a] behavioral health provider . . . actively on duty 24 hours per day for 7 days a week."[68]

Thereafter, Aetna denied Plaintiffs' claim on the basis that Waypoint Academy did not meet the Plan's definition of "Residential treatment facility" because it lacked "a behavioral health provider actively on duty 24 hours per day for 7 days a week."[69]  Aetna maintained this denial basis through both Plaintiffs' level one and level two appeals.[70]

---

[63] *Rasenack ex rel. Tribolet v. AIG Life Ins. Co.*, 585 F.3d 1311, 1319 (10th Cir. 2009).
[64] AR 1010.
[65] On October 1, 2019, coverage switched from the Deutsche Bank Medical Plan to an ERISA plan established or maintained by Thomas B.'s new employer, Bank of America.  Plaintiffs have dropped their claim involving the Bank of America Plan.  *Compare* ECF No. 15 *with* ECF No. 26.
[66] ECF No. 26, ⁋ 5.
[67] *See* AR 50 (noting a "Retrospective Review" with a "Retro dept. received claim Date: 1/31/2019").
[68] AR 49-50.
[69] AR 2-3.
[70] AR 603, 896-97, (Level One Appeal response); AR 882-83; 897 (Level Two Appeal response).

Plaintiffs concede that Waypoint Academy did not meet this Plan requirement.[71]  And

Plaintiffs acknowledge:  "Were Plaintiff to simply bring only a claim for wrongful denial of

benefits, that claim would automatically fail because the Plan's plain language . . . denies

coverage."[72]  Having failed to meet their burden to show Defendants' denial was arbitrary and

capricious, Plaintiffs' claim for benefits under 29 U.S.C. §1132(a)(1)(B) fails based on the

unambiguous Plan language and the undisputed facts in the administrative record.  The Court

therefore grants Defendants' Motion for Summary Judgment and denies Plaintiffs' Motion for

Summary Judgment as to Plaintiffs' claim for benefits under 29 U.S.C. §1132(a)(1)(B).

## II.    PLAINTIFFS' MHPAEA CLAIM

Plaintiffs seek to circumvent the deficiencies in their §1132(a)(1)(B) benefits claim by

arguing the Plan's "24/7" requirement should not be enforced because it is a violation of

MHPAEA.[73]  Under MHPAEA, "covered plans must ensure that: (1) 'treatment limitations

applicable to ... mental health or substance use disorder benefits are no more restrictive than the

predominant treatment limitations applied to substantially all medical and surgical benefits

covered by the plan (or coverage)'; and (2) 'there are no separate treatment limitations that are

applicable only with respect to mental health or substance use disorder benefits.'"[74]  "Treatment

limitations under the Parity Act include both quantitative treatment limitations, which are

expressed numerically (such as 50 outpatient visits per year), and nonquantitative treatment

limitations, which otherwise limit the scope or duration of benefits for treatment under a plan or

---

[71] ECF No. 73 at 11; *Thomas B. v. Aetna Life Ins. Co.*, Transcript, 4:4-5:7, January 21, 2025.
[72] ECF No. 73 at 11.
[73] *Thomas B. v. Aetna Life Ins. Co.*, Transcript, 9:15-10:15, January 21, 2025.
[74] *E.W. v. Health Net Life Ins. Co.*, 86 F.4th 1265, 1281 (10th Cir. 2023), *quoting* 29 U.S.C. §
1185a(a)(3)(A).

coverage."[75] Plaintiffs assert that the Plan's definition of residential treatment facility violates

MHPAEA because it imposes a nonquantitative treatment limitation on mental health benefits

that is more restrictive than the predominant treatment limitation the Plan imposes on analogous

medical surgical benefits.[76]

> To establish a MHPAEA claim, Plaintiffs have the burden to:
>
> (1) show "the relevant group health plan is subject to MHPAEA;"
> (2) "identify a specific treatment limitation on mental health or substance-use disorder benefits covered by the plan;"
> (3) "identify medical or surgical care covered by the plan that is analogous to the mental health or substance-use disorder care for which the plaintiffs seek benefits; and"
> (4) show "a disparity between the treatment limitation on mental health or substance-use disorder benefits as compared to the limitations that defendants would apply to the medical or surgical analog."[77]

Defendants do not dispute that the first two elements are met.  Defendants however claim

Plaintiffs fail to establish the third and fourth elements.  The Court agrees.

"The third element captures the comparison MHPAEA requires between the treatment

limitations applied to benefits for medical or surgical care and those applied to benefits for care

addressing mental health or substance-use disorders."[78]  As the Tenth Circuit has recently

explained:  "[W]e think it readily apparent from the statute itself that MHPAEA requires a

comparison between forms of treatment that are analogous."[79]  Similarly, the fourth element

"zero[s] in on disparities in limitations applied to benefits for medical or surgical care versus

---

[75] *Nathan W. v. Anthem BlueCross BlueShield of Wisconsin*, Case No. 2:20-cv-122, 2021 WL 842590, at *5 (D. Utah Mar. 5, 2021) (citing 29 C.F.R. § 2590.712(a); *see also* 29 U.S.C. § 1185a(a)(3)(B)(iii) (defining "treatment limitations")).
[76] ECF No. 62 at 9.
[77] *E.W.*, 86 F.4th at 1283.
[78] *Id.*
[79] *Id.* at 1284.

those applied to benefits for mental health or substance-use disorder treatment."[80]  Plaintiffs have

the burden to prove that "limitations on benefits for mental health" are "more restrictive than the

predominant treatment limitations applied to substantially all medical and surgical benefits

covered by the plan."[81]  "In addition to being either quantitative or nonquantitative, treatment

limitations can be either 'facial (as written in the language or the processes of the plan) or as-

applied (in operation via application of the plan).'"[82]  Here, Plaintiffs appear to assert both.[83]

However, Plaintiffs have not met their burden to show that the Plan, either on its face or as

applied, imposed a nonquantitative stricter treatment limitation on mental health benefits than the

predominant treatment limitations applied to substantially all medical and surgical benefits

covered by the Plan.

First, the Court finds on its face, the Plan imposes functionally the same requirements on

"residential treatment facilities" that it imposes on analogous "skilled nursing facilities,"

particularly as it relates to the "24/7" staffing requirement.[84]  Nothing in MHPAEA or ERISA

precludes Aetna and the Plan from imposing additional quality control measures on residential

treatment facilities so long as such measures are on par with the medical/surgical analogues.

Second, Plaintiffs fail to show that these Plan requirements were applied in a manner that

violates MHPAEA.  Contrary to Plaintiffs' argument, the record shows that Aetna and the Plan

imposed quality control requirements on both "Residential treatment facilities" and "Skilled

---

[80] *Id.*
[81] *Id.*; 29 U.S.C. § 1185a(a)(3)(A).
[82] *James C. v. Anthem Blue Cross & Blue Shield*, No. 2:19-cv-38, 2021 WL 2532905, at *18 (D. Utah June 21, 2021) (quoting *Peter E. v. United HealthCare Servs., Inc.*, No. 2:17-cv-435, 2019 WL 3253787, at *3 (D. Utah July 19, 2019) (unpublished)).
[83] *Thomas B. v. Aetna Life Ins. Co.*, Transcript, 15:8-15:22, January 21, 2025.
[84] AR 1010-11.

nursing facilities."[85]  These requirements are in addition to state licensing, which the Plan imposes on both.  For example, the Plan imposes 12 requirements to qualify as a residential treatment facility, one of which is the "actively on-duty" 24/7 requirement.  In the same manner, the Plan imposes 9 requirements on skilled nursing facilities, including "Provides 24 hour a day nursing care by licensed nurses directed by a full-time R.N."  The Plan's 24/7 requirement is essentially the same for either facility.  Even more, however, one of the 9 skilled nursing requirements is that the facility be either Medicare qualified or accredited by one of the Plan's listed accrediting agencies.  The requirement for Medicare certification[86] or accreditation by one of the listed agencies imposes yet additional requirements on skilled nursing facilities over and above the 8 additional requirements and simple state licensure.  Thus, Plaintiffs have failed to meet their burden to show that the Plan may not impose additional requirements on facilities beyond state licensing.  And an analysis of the Plan shows that it imposes them on both facilities in strikingly similar fashion.

Plaintiffs rely on their retained expert, Dr. Jeffrey Kovnick, as well as Defendants' expert, Dr. Andrew Mendonsa, to assert "that Aetna's requirement that 'Mental Health Residential Treatment programs must have a behavioral health provider actively on duty 24

---

[85] *Compare* AR 1010 (Residential Treatment Facility) *with* AR 1011-12 (Skilled Nursing Facility).

[86] The regulations applicable to skilled nursing care are those enforced by the Centers for Medicare and Medicaid Services ("CMS") including 42 U.S.C. § 1395i-3.  This statute provides its own detailed definition of "skilled nursing facility", including quality of service requirements, scope of service requirements, certifications by appropriate professionals, competency requirements, and a specific requirement that such facilities "must provide 24-hour licensed nursing services which is sufficient to meet nursing needs of its residents."  Even a cursory review of § 1395i-3 shows far greater quality controls on skilled nursing facilities than those the Plan places on residential treatment facilities.

hours per day for 7 days a week' does not reflect the generally accepted standard of care for those programs."[87]  The Plan does note that to be medically necessary, the "service or supply" must be, inter alia, provided "[i]n accordance with generally accepted standards of medical practice."  The Parties agree however that benefits were denied because Waypoint Academy did not meet the Plan's definition of a residential treatment facility, not because the treatment was not medically necessary.  The Parties also agree that MHPAEA does not require any specific standard of care.  MHPAEA requires <u>parity</u> in the "processes, strategies, evidentiary standards, or other factors used in applying the nonquantitative treatment limitation" for mental health benefits versus those for analogous medical/surgical benefits in the same classification.[88]  Plaintiffs have failed to meet their burden to show a violation of MHPAEA.

Therefore, the Court need not decide Defendants' motion to exclude Dr. Kovnick under Federal Rule of Evidence 702.  Even if Dr. Kovnick were qualified under Rule 702, and Defendants' expert Dr. Mendonsa meaningfully corroborated Dr. Kovnick's claims or his expert opinion, Plaintiffs' MHPAEA claim would still fail.

Additionally, to establish a MHPAEA violation, Plaintiffs have the burden of showing, among other elements, "a disparity between the treatment limitation on mental health or substance-use disorder benefits as compared to the limitations that defendants would apply to the medical or surgical analog."[89]  Plaintiffs have presented no evidence as to what the alleged "generally accepted standard of care" is for a skilled nursing facility.  Dr. Kovnick cannot opine on this topic as he admittedly never worked for a skilled nursing facility and therefore has no

---

[87] ECF No. 62 at 9
[88] 29 C.F.R. § 2590.712(c)(4)(I).
[89] *E.W.*, 86 F.4th at 1283.

experience with the type of care a skilled nursing facility may provide or whether there exists a national "generally accepted standard of care."[90] And nothing in Dr. Mendonsa's report purports to opine on a standard of care for skilled nursing facilities.[91]

To prevail on their MHPAEA claim, it is not enough for Plaintiffs to allege that the Plan's requirements for residential treatment facilities are not in keeping with generally accepted standards of medical practice. They must establish that claim with evidence which they have not done. Moreover, given the allegations, Plaintiffs would need to show that the additional requirements imposed on skilled nursing facilities (as the alleged medical/surgical analogue) were in keeping with generally accepted standards of medical practice. Plaintiffs have failed to provide any such evidence.

Accordingly, the Court grants Defendants' Motion for Summary Judgment and denies Plaintiffs' Motion for Summary Judgment as to Plaintiffs' claim for violations of MHPAEA under 29 U.S.C. § 1132(a)(3). The Court further denies Defendants' Motion to Exclude Plaintiffs' Expert Dr. Jeffrey Kovnick as Moot.

## **ORDER**

For the reasons articulated above:

1.    Defendants' Motion for Summary Judgment[92] is GRANTED.

2.    Plaintiffs' Motion for Summary Judgment[93] is DENIED.

3.    Defendants' Motion to Exclude Plaintiffs' Expert Dr. Jeffrey Kovnick[94] is

---

[90] *See* ECF No. 65, Ex. B, at 112:13-21, 230:12-23; Ex. C.
[91] *See* ECF No. 62, Mendosa Report attached thereto as Ex. A.
[92] ECF No. 63.
[93] ECF No. 62.
[94] ECF No. 65.

DENIED as MOOT.

4.      Judgment shall be entered in favor of Defendants and against Plaintiffs.

5.      The Clerk is directed to close the case.


DATED this 24 March 2025.


_____
Dustin B. Pead
United States Magistrate Judge